UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X

UNITED STATES OF AMERICA


    -against-                                  19-cr-442 (S-1) (BMC)


THOMAS SCORCIA,

              Defendant.

----------------------------------------------------X



## SENTENCING MEMORANDUM ON
## BEHALF OF THOMAS SCORCIA




Vincent J. Romano, Esq.
9201 4th Ave, Ste. 704
Brooklyn, NY 11209
(718) 852-5200
vromano13@aol.com

Anthony DiPietro, Esq.
Law Offices of Anthony DiPietro, P.C.
15 Chester Avenue
White Plains, NY 10601
(914) 948-3242
Dipietrolaw@yahoo.com

*Attorneys for Defendant*
*Thomas Scorcia*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

I.    Relevant Law ............................................................................................................ 1

II.   Mr. Scorcia's Guilty Plea........................................................................................ 3

   A.   Racketeering Act Two ......................................................................................... 3

   B.   Racketeering Act Thirteen .................................................................................. 3

III.  The Applicable Guidelines Range ......................................................................... 4

IV.   The 3553(a) Sentencing Factors ............................................................................ 5

   A.   The Nature and Circumstances of the Offense and the History and Characteristics of
        the Defendant....................................................................................................... 7

   B.   The Need for the Sentence Imposed .................................................................. 11

   C.   The Kinds of Sentences Available...................................................................... 12

   D.   The Sentencing Range Established for Defendant's Offenses & The Need to Avoid
        Unwarranted Sentence Disparities.................................................................... 13

V.    Mr. Scorcia's Extraordinary Rehabilitative Efforts ......................................... 15

   A.   The Focus Forward Project............................................................................... 15

   B.   The Suicide Companion Program...................................................................... 16

   C.   The Leadership Series Program ........................................................................ 16

   D.   The GED Arts Program ..................................................................................... 17

   E.   Examining Your Life Program .......................................................................... 17

   F.   Emotional Self-Regulation Program................................................................. 17

   G.   American Bible Academy Courses .................................................................... 18

   H.   Health Course.................................................................................................... 18

   I.    Financial-Modified Operations Program ......................................................... 18

   J.    Sentry Journal Eat Smart Course ..................................................................... 19

   K.   Finance-Operations Program ........................................................................... 19

L.     Exchange-Traded Funds Course .................................................................... 19

M.    Sentry Personal Health Journal ................................................................... 19

N.    Resume Writing Course ............................................................................... 19

O.    Anger Management Course .......................................................................... 20

P.    Additional Rehabilitative Efforts ............................................................... 20

VI.    The Harsh Conditions of Mr. Scorcia's Pretrial Imprisonment ................................... 21

VII.    The Court Should Reject the Sentencing Recommendation of Probation and Scrutinize the Offense Narrative Provided in the PSR ............................................................................. 28

CONCLUSION ....................................................................................................... 37

## **INTRODUCTION**

We respectfully submit this memorandum to assist the Court in determining an appropriate sentence for Defendant Thomas Scorcia, who is scheduled to be sentenced on March 12, 2021 at 12:00 pm.

As discussed below, in applying to Mr. Scorcia both the mandate in §3553(a) that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that a sentence of twenty-seven (27) months incarceration is an appropriate punishment to achieve the aims of sentencing.[1] In this regard, Mr. Scorcia is a first-time offender with strong ties to his community and family. He has demonstrated extraordinary rehabilitation since his arrest, and he has already served a long and harsh term of imprisonment in this case due to the extremely restrictive measures undertaken by the Federal Bureau of Prisons to deal with the COVID-19 pandemic. Collectively, such factors, among the other favorable reasons discussed herein, strongly militate in favor of the Court imposing a sentence of twenty-seven (27) months incarceration.

## I. **Relevant Law**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held the Sentencing Guidelines to be merely advisory. District Courts now must consider the Guidelines along with all of the other sentencing factors set out in 18 U.S.C. § 3553(a). *United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005).

---

[1] As explained *infra* (*see* III, IV, V), a sentence of 27-months will reflect a sentence at the low end of the advisory Guidelines range presented by the defense's calculation (27-33 months), or it will constitute a well-deserved downward departure (based on Mr. Scorcia' harsh pre-trial confinement during the COVID-19 pandemic and his extraordinary rehabilitation (*see infra*, at V, VI)) from the advisory range that was stipulated to by the government in the plea agreement (37-46 months).

In *Gall v. United States*, the Supreme Court set forth the procedure and order of consideration for district courts to follow at sentencing: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and benchmark." 128 S.Ct. 586, 596 (2007). Next, a sentencing court should "consider all of the Section 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Id.* at 596-97.

Title 18, U.S.C. 3553(a) instructs district courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." *See also Kimbrough v. United States*, 552 U.S. 85, 102 (2007). 18 U.S.C. § 3553(a)(2) provides that these sentencing purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) requires consideration of still other factors in imposing a sentence "not greater than necessary," including: (1) the nature and circumstances of the offense and history and characteristics of the offender; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victims of the offense.

Finally, in deciding an appropriate sentence, "it is uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate…the crime and the punishment to ensue." *United States v. Koon*, 116 S.Ct. 2035 at 2053(1996). Thus, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Title 18, U.S.C. Sec. 2661.

## II. <u>Mr. Scorcia's Guilty Plea</u>

On November 25, 2020, Thomas Scorcia pleaded guilty, pursuant to a written plea agreement, before the Honorable Vera M. Scanlon (U.S.M.J., E.D.N.Y.) to Count One (Racketeering) of the instant indictment. In connection with such plea, Mr. Scorcia admitted to participating in two racketeering acts (Racketeering Acts Two and Thirteen ("RA")), which alleged his participation in the extortionate extension and collection of credit.[2]

### A. Racketeering Act Two

In regard to RA Two, Mr. Scorcia admitted to participating in conduct violative of Title 18, U.S.C. §892(a), in that he "knowingly engaged in the extortionate extension of credit to an individual described in the indictment as John Doe #2. The extension of credit involved an implied threat of economic harm to his reputation if the borrower failed to repay the loan."

### B. Racketeering Act Thirteen

In regard to RA Thirteen, Mr. Scorcia admitted to participating in conduct violative of Title 18, U.S.C. §894(a), in that he "knowingly engaged in extortionate means in an attempt to collect a debt from an individual described in the indictment as John Doe #11. There was an implied threat of economic harm to his reputation if the borrower failed to repay his loan."

---

[2] Mr. Scorcia did not stipulate to participating in any other racketeering acts alleged in the indictment under Count One, and those allegations remain contested for the purpose of sentencing.

### III. The Applicable Guidelines Range

Pursuant to Mr. Scorcia's above-cited plea, the total adjusted offense level is 18, with an advisory Guidelines sentencing range of 27-33 months. Specifically, the applicable Guidelines range should be determined based solely on the two racketeering acts in which Mr. Scorcia admitted guilt.[3] While the plea agreement that was executed by the parties incorporates all eight (8) racketeering acts into the Guidelines analysis (*see* Plea Agreement at p. 3),[4] Mr. Scorcia maintains that U.S.S.G. §3D1.4 shall apply only to admitted conduct and that all other allegations contained in Count One (RA's 1, 3, 9, 10, 11, and 14) should not be included in the Multiple Racketeering Act Analysis unless the government can prove Mr. Scorcia's participation by a preponderance of the evidence in those acts at the time of sentencing.[5]

Thus, the applicable Guidelines analysis should reflect only a 2 unit increase under U.S.S.G. §3D1.4 for Mr. Scorcia's conviction on RAs 2 and 13, as opposed to a five (5) level increase based on the incorporation of contested conduct. To this end, the advisory Guidelines should be computed as follows:

---

[3] The government is aware that Mr. Scorcia would advance this position, and it agreed (prior to the execution of the plea agreement) that such argument could be presented without issue. During Mr. Scorcia's plea hearing, undersigned counsel also notified the Court about Mr. Scorcia's position on the applicable Guidelines range, noting that Mr. Scorcia disagreed with the proposed Guideline's analysis as set forth in the plea agreement and that he was maintaining the right to contest such analysis at sentencing.

[4] With such contested inclusions, the advisory Guidelines range is 37-46 months according to an adjusted offense level of 21.

[5] The plea agreement refers to the United States Guidelines Section 3D1.4, which the government describes as the Multiple Racketeering Act Analysis on page 3 of the plea agreement. Chapter 3 of the Guidelines Manual is a multiple counts analysis that refers to multiple counts of conviction according to U.S.S.G. §3D1.1. The Guidelines Manual in Chapter 3 permits the grouping of counts of conviction when a defendant has been convicted of more than one count. To this end, the Court shall determine the combined offense level applicable to all groups taken together by applying the rules specified in U.S.S.G. §3D1.4. *See* U.S.S.G. §3D1.1(a)(3).

```
R.A. 2: Extortionate Extension of Credit - John Doe #2
Base Offense Level (§ 2E2.1(a))          20


R.A. 13: Extortionate Collection of Credit – John Doe #11
Base Offense Level (§ 2E2.1(a))          20


Multiple Racketeering Act Analysis (§ 3D1.4)
Highest Adjusted Offense Level           20

Units:
Racketeering Act 2 (§ 3D1.4(a))          +1 unit
Racketeering Act 13 (§ 3D1.4(a))         +1 unit
TOTAL UNITS                              2
Levels Added (§3D1.4)                    +2 levels
Less: Global Resolution (§5k 2.0)        -1
Less: Acceptance of Responsibility.      -3


Total Adjusted Level                     18
```

Accordingly, since Mr. Scorcia has no criminal history, a total adjusted level of level 18 would result in an advisory Guideline range of 27-33 months in this case.

## IV.    The 3553(a) Sentencing Factors

As explained below, when considering all of the relevant 3553(a) factors, a sentence of 27-months imprisonment would be most appropriate in this case, especially considering Mr. Scorcia's history and the harsh 17-months of pretrial imprisonment that he has already endured. *Cf., United States v. Canizales*, 2013 U.S. Dist. LEXIS 175424, * 6 (E.D.N.Y. 2013) ("General deterrence is satisfied by the [year-and-one-day] sentence imposed; it sends a clear message that involvement in a drug conspiracy—no matter how minor—will result in the stain of a federal criminal conviction. Specific deterrence has been substantially achieved through the restrictions imposed by supervised release."); *United States v. Francis*, 2013 U.S. Dist. LEXIS 138603, * 6 (E.D.N.Y. 2013) ("General deterrence is satisfied by the felony conviction and its collateral consequences").

While the offenses of conviction are admittedly serious, the record overwhelmingly demonstrates that Mr. Scorcia is prepared to return to his community as a positive contributor. Indeed, Mr. Scorcia has no prior criminal record, and he has utilized his time while imprisoned to strive towards self-betterment. Not only did Mr. Scorcia engage in numerous programming opportunities during his imprisonment, but also, he has performed numerous acts of goodwill to the benefit of both staff and inmates. (*See infra*, at V). By all measures, Mr. Scorcia's conduct while imprisoned is exemplary, and it reflects his sincerity to return to his community as a productive and law-abiding father, husband, son, friend and neighbor.

Moreover, Mr. Scorcia's imprisonment for almost two years during a global pandemic is no trivial matter, especially since he had never been arrested prior to this case. *See United States v. Lenagh*, 2009 WL 296999, at *6, 2009 U.S. Dist. LEXIS 9226 (D. Neb. Feb. 6, 2009) ("A sentence of 24 months is a significant sentence, especially to an offender who has never been incarcerated at all.").

Indeed, during the past 17-months, Mr. Scorcia has been subjected to harsh prison conditions, exacerbated by continuous lockdowns and a complete lack of social/family visiting. (*See infra*, at VI). While prison is supposed to serve as a form of punishment, it is not supposed to be a mechanism of trauma to the degree that has been caused by the COVID-19 pandemic. *See, e.g., United States v. De Jesus*, 20-cr-19 (PAE) (S.D.N.Y., July 1, 2020) (considering at sentencing the harsh prison conditions suffered by the defendant as a result of the COVID-19 pandemic, explaining that "[a]ny mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that [the defendant] experienced.").

## A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Pursuant to Title 18 U.S.C. §3553(a)(1), the Court shall evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." Here, such factor compels leniency.

Mr. Scorcia is a first-time offender, who has accepted responsibility for his wrongdoings.[6] While these wrongdoings are relevant to this moment, they don't remotely define Mr. Scorcia's history and good character. Mr. Scorcia has been in custody since his arrest on October 3, 2019 at the Metropolitan Detention Center ("MDC") in Brooklyn NY and his prison record is exemplary (i.e., accounting for no disciplinary history and completion of numerous rehabilitative programs). Mr. Scorcia is in good mental and emotional health and has no history of substance abuse.

Prior to his arrest, Mr. Scorcia was gainfully employed. Mr. Scorcia is a plumber by trade and has been in that industry for the past 36 years. He is a former one-third partner in ABR Plumbing Company, which is based in Brooklyn, New York.[7] A non-exhaustive compilation of the positive role that Mr. Scorcia has played as a business owner is best illustrated by the many letters of support that he received from his prior business associates and employees in connection with this proceeding:

- "*He worked in my plumbing company as a young man. He was always a good person and respectful to everybody.*" Exhibit A (Letter of Irving Brofsky, who was Mr. Scorcia's neighbor and had introduced Mr. Scorcia to the plumbing business several decades ago);

- "*We have employees that have been with us for over 20 years, and they all love Tom. Whenever a problem arose, Tom was there to make things right.*" Exhibit B (Letter of Robert Brofsky, who is the son of Irving Brofsky, and started ABR Plumbing with Mr. Scorcia in 1994);

---

[6] The facts relating to Mr. Scorcia's plea are discussed *supra* (*see supra*, at II).

[7] Mr. Scorcia has also worked whenever possible at the prison and has been described by prison staff as being an outstanding worker.

- *"Thomas has taught me a lot over the years, not just about plumbing, but guiding me in making the right choices in life and with family."* Exhibit C (Letter of Sean Carlson, who is an employee of ABR Plumbing);

- "*It's not the same here without you. You're easily one of the best men I know, and you have the biggest heart. You've always gone above and beyond for me and I'd* like to *return the favor any way I can*." Exhibit D (Letter of Victor Cadicamo, who is an employee of ABR Plumbing);

- "*I wanted to write to you to show you my appreciation and to let you know that you are not alone, I've been with ABR for 18 years, thanks to you, I had the opportunity to change my life for the better and I'm forever thankful*." Exhibit E (Letter of Kevin Rodriguez, who is an employee of ABR Plumbing).

In addition to being a successful business owner, Mr. Scorcia is a loving son, husband, and father. He was born on December 30, 1966 in Brooklyn, New York, to the marital union of Anthony and Catherine Scorcia.[8] Mr. Scorcia resided with his parents until 1988 when he moved to Staten Island with his first wife. Mr. Scorcia's mother, Catherine Scorcia, suffers from macular degeneration and is legally blind (*See* Exhibit G, at 2). She also suffers from three types of cancers: breast cancer, colon cancer, and bone cancer. Mr. Scorcia has always provided residence and support to his mother, along with whatever additional aid was needed to help her cope with her aging and significant illnesses.

Mr. Scorcia has no surviving siblings. His sister Janice passed away from cancer at the age of 45, and his sister Patricia passed away at the age of 32. His sister's son, Joseph, also more recently passed away, which has devastated the entire Scorcia family. While Mr. Scorcia has had to endure the tragic events of losing his siblings and nephew, he has utilized such hardships as a motivating factor to always offer assistance to those in need of help. To this end, Mr. Scorcia's desire to assist in the prison's suicide program is predominantly fueled by his unwavering desire to help others in need. (*See infra*, at V (discussing Mr. Scorcia's participation in the suicide

---

[8] Anthony Scorcia is deceased, and Catherine Scorcia (87 years old) resides at Mr. Scorcia's residence in Staten Island.

prevention program at the MDC, and his volunteering in that program to help ensure that inmates who were in distress did not physically harm themselves)).

As Mr. Scorcia's wife explains, "*Still until this day, my husband continues to struggle with the mention of his sisters' loss, his father's passing, and his mother's declining health. The pain he endured watching his parents suffer from the loss of their daughters and his sisters and dealing with his own pain was nothing short of easy. Thomas found solace and comfort by turning to his Christian faith for strength and guidance.*" Exhibit F (Letter of Linda Scorcia). Mrs. Scorcia further explains that the loss of Mr. Scorcia's nephew "*hurt Thomas so much more than the pain of losing his two sisters to cancer. Joseph's death became so profound because Thomas took that innocent six-year-old little boy's hand at his mother's wake and promised to always take care of him.*" *Id.*

Mr. Scorcia was married to his first wife, Josephine in 1987. They have four children together: Anthony (30 years old), Thomas (23 years old), Falyn (21 years old), and Michael (19 years old). The children are all in good health, educated and gainfully employed. Mr. Scorcia is currently married to his wife of fifteen (15) years, Linda Scorcia. They have one child together, Lordan (15 years old).

Mr. Scorcia has always provided support for his children and ensured that education was central to their upbringing. As Mr. Scorcia's mother, Catherine Scorcia, explains, "*Thomas has raised all his children with family values, the importance of school and education. Thomas' children all graduated High School and College with high honors*." Exhibit G (Letter of Catherine Scorcia).

The support provided by Mr. Scorcia to his family was always evident and a dominate quality. Liana Amodeo, who is friends with Linda Scorcia and has known Thomas for the past 14

years, explains that "*Thomas is truly a family man, putting his family and friends' needs before his own. [He] loves to see his family and children happy and stable. He is a model father, a man of integrity and loyalty, instilling great qualities in each of his kids. They are all successful and happy today.*" Exhibit H (Letter of Liana Amodeo).

Mr. Scorcia's son, Thomas J. Scorcia, also passionately highlights for the Court many of his father's positive traits and his role as a supporting father: "*He has never not shown support for my ventures and always placed his faith in me. I think he realized that he raised me right and trusted me to act as a gentleman should.*" Exhibit I (Letter of Thomas J. Scorcia).

Mr. Scorcia's family and friends are all aware of his current conviction and pending sentence, and all remain supportive. The support shown by Mr. Scorcia's family and friends is illustrative of the positive impact that Mr. Scorcia has had within his community and their personal fondness of Mr. Scorcia's good character. As reflected by the many supporting letters received in connection with this proceeding, it is evident that Mr. Scorcia is surrounded by a very supportive group of family and friends, all of whom are willing to help Mr. Scorcia return to the community as a positive contributor.

In this regard, it cannot be overstated that the public will be best served by allowing Mr. Scorcia the opportunity to rebuild his life with his family at this time, not by requiring his further imprisonment and the corresponding diminution in his ability to find lawful work and to productively reenter his community at a significantly later date. *See United States v. K*, 160 F. Supp. 2d 421, 423 (E.D.N.Y. 2001) ("While protecting the public, the federal district judge's duty is to try to save as many of the people before the court as it can—one person at a time in accordance with the law.").

**B. The Need for the Sentence Imposed**

Pursuant to 18 U.S.C. §3553(a)(2), the Court should consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

In relation to this factor, it cannot be overstated that Mr. Scorcia's 17-months of harsh imprisonment during a global pandemic has already provided a just punishment and serves as an adequate deterrent. Also, given Mr. Scorcia's proven commitment to self-betterment and familial support system, he poses no threat upon release.

Furthermore, Mr. Scorcia is abundantly aware of the level of seriousness of the instant offense. This is his first conviction at the age of 53 years old and he has no prior contact with the criminal justice system. Mr. Scorcia's good works while imprisoned, coupled with the difficultness of his confinement during the COVID-19 pandemic, solidifies his complete lack of desire to ever repeat this process. Indeed, Mr. Scorcia has proven this point by unabatingly participating in extensive programming during his time imprisoned and attaining numerous certificates from the Federal Bureau of Prisons. *See infra*, at V (discussing Mr. Scorcia's rehabilitative efforts).

In regard to "just" punishment, Mr. Scorcia has already suffered greatly as a result of his wrongdoings. He has been detained at the MDC since October 3, 2019. His pre-trial detention at the MDC has been harsh due to the chaos caused by the ongoing COVID-19 pandemic. For the past year, Mr. Scorcia been subjected to continuous lockdowns, unsanitary conditions, and inhumane liberty constraints. He had no social visits with his wife or his five children since March 11, 2020, nor an in person legal visit during the same timeframe. At various times, Mr. Scorcia

was largely locked inside his cell between 21-24 hours per day and he was not permitted to shower or contact his family and lawyers for days/weeks on end. Clearly, the uniquely harsh pre-sentence conditions suffered by Mr. Scorcia serves as an adequate deterrence to accomplish the aims of punishment. (*See infra*, at VI (discussing in detail Mr. Scorcia's harsh confinement)).

Accordingly, the Court's imposition of a sentence of twenty-seven (27) months would be most appropriate here, serving as a sufficient punishment and deterrent given the harshness of the pretrial confinement that Mr. Scorcia endured, while also enhancing respect for our criminal justice system by not requiring an unnecessarily longer term of imprisonment for a defendant that has already demonstrated his rehabilitation. *Cf., United States v. Ben-Yhwh*, 453 F. Supp. 3d 1324, 1333 (D. Haw. 2020) (continuing to incarcerate individuals who are not a danger to any person or the community during this pandemic, "would impose a sentence greater than necessary to comply with the statutory purposes of punishment and would be unnecessarily cruel.").

### C. The Kinds of Sentences Available

Pursuant to §3553(a)(3), the Court should consider the "the kinds of sentences available" for the defendant. Here, Mr. Scorcia pleaded guilty to Count One in the instant indictment charging him with Racketeering in violation of 18 U.S.C. §1962. The defendant also admitted to his participation in Racketeering Acts 2 and 13.

While the plea agreement calculates an advisory guideline range of 37-46 months according to an adjusted guideline level 21 with a Category I criminal history (*see supra*, at III), it is respectfully submitted that the adjusted guideline range should be 27-33 months according to an adjusted guideline level of 18 and a Category I criminal history. Most important, for the mitigating reasons stated herein, a sentence of twenty-seven (27) months would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Also, Mr. Scorcia has already voluntarily disgorged monies received in connection with his wrongdoings, forfeiting $75,000 in advance of sentencing. This is a significant punishment, especially considering that Mr. Scorcia has been imprisoned for almost two years and the COVID-19 pandemic has negatively impacted the trajectory of his ability to earn a living going forward.[9] In addition to that significant penalty, Mr. Scorcia has to regain the trust of his wife and five (5) children and make amends with his former business partners.

**D. The Sentencing Range Established for Defendant's Offenses & The Need to Avoid Unwarranted Sentence Disparities**

Pursuant to §3553(a)(4) & (6), the Court should consider "the kinds of sentence and the sentencing range established for…the applicable category of offense committed by the defendant as set forth in the guidelines" and consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Here, the applicable reference point for a violation of Title 18, U.S.C. §1962(c) is U.S.S.G. §2E1.1(a), which indicates that the type of racketeering activity will determine the base offense level. According to the Guidelines, Racketeering Acts 2 and 13 are grouped together as per U.S.S.G. §3D1.2(b) but are not grouped with any of the other Racketeering Acts. The defense agrees that the applicable Guideline level for the extortionate extension of credit and the extortionate collection of credit for Acts 2 and 13 provides a base offense level of 20.

---

[9] While §3553(a)(7) calls for consideration of restitution to the victims of a defendant's offense, the government has not provided any figures to the defense during the discovery phase to allow for such considerations nor has it shown that any alleged victim incurred an actual loss. Also, since Mr. Scorcia has voluntarily disgorged any potential proceeds from his wrongdoings, forfeiting $75,000 to date and will have to reestablish himself (supporting his wife and children) after serving a term of imprisonment, it would be both excessive and counterproductive to impose additional financial penalties that will further penalize Mr. Scorcia following his release.

Notably, Racketeering Acts 1, 3, 9, 10, 11 & 14 cannot be grouped together with Racketeering Acts 2 and 13. Although these racketeering acts are considered relevant conduct and are considered for Guidelines purposes; however, the government is required to prove these racketeering acts by a preponderance of the evidence. As explained above, the defense is prepared to oppose the inclusion of these other racketeering acts for Guideline calculation purposes.

Mr. Scorcia clearly demonstrated acceptance of responsibility for the instant offense and the government was notified in a timely manner of the defendant's intention to enter a plea of guilty. Thus, a three (3) level decrease in the guideline calculations is appropriate pursuant to U.S.S.G. §3E1.1(a) and (b). Also, a one (1) level decrease for the global plea reduction as outlined in the plea agreement is appropriate, based upon the fact that the criteria has been satisfied for that reduction.

Based upon the advisory Guidelines range and all other relevant factors under 3553(a), a sentence of twenty-seven (27) months would be both appropriate under the circumstances and consistent with the sentences received by other similarly situated defendants. To be sure, similarly situated defendants in this district have recently received comparable sentences without having the benefit of Mr. Scorcia's compelling rehabilitation record and the mitigating factor of serving a harsh term of pre-trial imprisonment. *See, e.g., United States v. Vincent Esposito*, 18-cr-00014 (VM) (sentencing the lead defendant to 24-months imprisonment following his conviction for extortionate conduct over an extensive 17-year time period); *United States v. Joseph Maratea*, 18-cr-337-5 (WFK) (April 15, 2020) (sentencing the defendant to time served (after his service of 20-months imprisonment) plus a period of home confinement for racketeering conduct that was arguably more serious than alleged in the instant matter).

## V.    **Mr. Scorcia's Extraordinary Rehabilitative Efforts**

Mr. Scorcia was arrested and detained on October 3, 2019 following a hearing before Magistrate Judge Scanlon.  He was remanded to the MDC Brooklyn, where he currently remains. As outlined below, since the moment of his detention, Mr. Scorcia has taken the initiative to participate in mostly all of the rehabilitative programs that were available to him.

### A.  The Focus Forward Project

During his pretrial imprisonment, Mr. Scorcia completed the Focus Forward Project, which is a 12-week course dedicated to providing an educational curriculum focused on the reentry of individuals charged with federal crimes. The primary goal of the program is to provide Mr. Scorcia and the other participants with the confidence and practical tools to successfully move forward with their lives. The class' requirements were demanding, especially in a prison setting. Aside from requiring the inmate's attendance in a weekly two-hour class for twelve consecutive weeks, each participant was required to complete weekly readings, make journal entries, and complete other homework assignments.

On March 3, 2020, Mr. Scorcia received a Certificate of Achievement from the Class Facilitator, Elizabeth Irwin and the Interim Director, Joel Putman. As reflected by Ms. Irwin's letter to the Court, Mr. Scorcia excelled in this program.  Writing personally to Mr. Scorcia about his achievement, Ms. Irwin noted, "You have grown a great deal in your public speaking and the effort you have put in overall for this course is tremendous.  You support your fellow classmates while also looking always to better yourself." (*See* Exhibit J, at 1.)

Overall, Mr. Scorcia placed a great deal of effort in participating and completing this program and felt a sense of accomplishment when he proudly received the certificate of completion. To this end, Ms. Irwin's letter to the Court in support of Mr. Scorcia best highlights the Focus Forward program, her favorable insight and interaction with Mr. Scorcia and her opinion

and observations of Mr. Scorcia's work ethic.  Ultimately, it should not go unnoticed that "[t]he effort [Mr. Scorcia] put in overall for this course [was] tremendous." (*See* Exhibit J, at 2.)

**B.  The Suicide Companion Program**

Mr. Scorcia participated in the Suicide Companion Program from April 16, 2020 through May 29, 2020.  This program is sponsored by the MDC and moderated by the Staff Psychologist and the Suicide Companion Program Coordinator, B. Huber, Psy.D., LP, and the Chief Psychologist C. Ortega, Ph.D., LP.

Mr. Scorcia was selected because he demonstrated a level of trustworthiness, dependability, and respect for others within the institution.  The certification that Mr. Scorcia received upon completion noted, "Mr. Scorcia completed all requisite trainings and completed suicide watch duties in exemplary fashion during his work as a Suicide Companion." (*See* Exhibit K.). Ultimately, Mr. Scorcia demonstrated a great deal of humility and empathy by assisting other inmates who were in distress, and by undertaking measures to potentially save another person's life.  Mr. Scorcia's selfless concern for others under the present circumstances is admirable and commendable and should provide a clear picture for the Court of Mr. Scorcia's good character.

**C.  The Leadership Series Program**

On January 14, 2020, Mr. Scorcia completed the Leadership Series Program, which is an instructor-led training program developed by the Education Department at the MDC in conjunction with St. Francis College. (*See* Exhibit L). Mr. Scorcia excelled in this course and he received a certificate of completion. The main focus of this program was to combat racism and to provide inmates guidance on how to better get along with others.  Mr. Scorcia undoubtedly improved himself as a person by better educating himself on these topics.

### D. The GED Arts Program

Mr. Scorcia completed the GED Language Arts Program, which is sponsored and approved by the MDC Brooklyn Education Department and the Federal Bureau of Prisons. J. Martinez, who is the Education Technician at MDC Brooklyn was the moderator of the program. Mr. Scorcia participated in all eight (8) classes relevant to this program (12-hours in total), which required Mr. Scorcia to engage in reading comprehension, essay writing, and other educational exercises. Mr. Scorcia proudly received a certificate of completion on January 15, 2020. (*See* Exhibit M).

### E. Examining Your Life Program

On February 14, 2020, Mr. Scorcia completed the Examining Your life program, which is an instructor-led training program facilitated by St. Francis College in conjunction with the Department of Justice and the Federal Bureau of Prisons. (*See* Exhibit N). Dr. M. Gantt, who is the supervisor of Education, moderated this program, which was geared towards teaching inmates how to make the correct choices in life and to further develop consequential thinking when they are faced with difficult decision-making. Mr. Scorcia's completion of this three (3) hour course further demonstrates the serious effort he has undertaken to ensure a positive reentry into his community, seeking to make better choices in life going forward.

### F. Emotional Self-Regulation Program

On February 21, 2020, Mr. Scorcia completed the Emotional Self-Regulation Program, which is sponsored by the M.D.C. Brooklyn and moderated by the facility's staff psychologist, Dr. Huber, Psy.D. *(See* Exhibit O). Mr. Scorcia participated in all eight (8) classes (sixteen-hours in total) relevant to this course, which taught inmates aspects of psychology and the need for one's self-regulation. Mr. Scorcia's voluntary participation in this course also demonstrates his sincere willingness to improve himself as a person and to not repeat the legal process.

**G. American Bible Academy Courses**

During the twenty-four-hour daily lockdowns at the MDC, Mr. Scorcia engaged in programs sponsored by the American Bible Academy in conjunction with the Prison Outreach International and supervised by the Academic Dean, Joseph Welch. He participated in these programs while confined to his cell and facing the chaotic environment that consumed the MDC due to the COVID-19 pandemic.

Mr. Scorcia was given one booklet for a two-week period in which he was required to read and study program materials. He was also given a test on each completed booklet for a four-part biblical series:

- On May 5, 2020, Mr. Scorcia completed <u>The Gospel of John</u> and passed the required examination. He received a certificate of completion from the Academy. (*See* Exhibit P, at 1);
- On June 16, 2020, Mr. Scorcia completed the <u>Christian Doctrine, Vol. 1</u> booklet and passed the required examination and received a certificate of completion from the Academy. (*See* Exhibit P, at 2);
- On July 21, 2020, Mr. Scorcia completed the <u>Christian Doctrine, Vol. 2</u> booklet and passed the required examination and received a certificate of completion from the Academy. (*See* Exhibit P, at 3);
- On August 25, 2020, Mr. Scorcia completed the final part of the four (4) part series entitled <u>The Book of Acts, Vol. 1</u>, and received a certificate of completion from the Academy. (*See* Exhibit P, at 4).

**H. Health Course**

On May 13, 2020, Mr. Scorcia completed a three-part booklet series and passed three separate tests relating to this health course. He received a certificate of completion in recognition of the completion of the self-study course, which was sponsored by the Federal Bureau of Prisons and the MDC Education Department. (*See* Exhibit Q).

**I. Financial-Modified Operations Program**

On June 26, 2020, Mr. Scorcia completed the Financial-Modified Operations program, which was a six class, twelve-hour course, focusing on teaching inmates about finances and money

management. (*See* Exhibit R).

**J.  Sentry Journal Eat Smart Course**

On July 17, 2020, Mr. Scorcia completed the Eat Smart course, which was offered by the MDC Brooklyn Recreation Department and moderated by Recreation Specialist, K. White. (*See* Exhibit S). The program's goals were to teach inmates how to eat the proper food with the appropriate nutritional value.  The program promoted healthy eating habits and nourishment.

**K.  Finance-Operations Program**

On July 27, 2020, Mr. Scorcia completed the Finance-Modified Operations course, which was Part 2 of the three-part series of financial courses offered by the Education Department at the MDC. (*See* Exhibit T). This finance course involved six, two-hour classes, focusing on teaching inmates about investment funds, ROTH IRA accounts, finance accounts, certificates of deposit (CD's), and IRA accounts.

**L.  Exchange-Traded Funds Course**

On August 7, 2020, Mr. Scorcia completed the Exchange-Traded Fund course, which was Part 3 of the three-part series of financial courses offered by the Education Department at the MDC Brooklyn. (*See* Exhibit U). This course involved six, two-hour classes, focusing on teaching inmates to budget their money in a structural manner.

**M. Sentry Personal Health Journal**

On November 9, 2020, Mr. Scorcia completed the Personal Health Journal course, which was moderated by the Recreation Specialist, K. White and sponsored by the Recreation Department at the MDC. (*See* Exhibit V). This twelve-hour, self-study course required participants to maintain a journal and engage in book studies.

**N.  Resume Writing Course**

On November 30, 2020, Mr. Scorcia completed the Resume Writing course, which assisted inmates with resume writing and provided tips to help them secure full-time employment upon

release. The course was eight-hours with a testing requirement. Mr. Scorcia excelled in this course and received a certificate of completion from Mr. Greco, who is the Supervisor of Education. Furthermore, Mr. Scorcia received a symbol of excellence affixed to his certificate, which demonstrated that he performed exceptionally well. (*See* Exhibit W).

### O. Anger Management Course

On December 8, 2020, Mr. Scorcia completed the Self Help: Anger Management course, which was taught by the Staff Psychologist, Dr. Trauffer, and sponsored by MDC Brooklyn. This course involved Mr. Scorcia's presence for a total of twelve hours over a five (5) week period with required testing. The course focused on teaching inmates how to maintain their emotions and composure at all times. This course has assisted Mr. Scorcia on how to become a better person and have a better self-awareness in times of high emotion. (*See* Exhibit X).

### P. Additional Rehabilitative Efforts

In addition to the above cited courses, Mr. Scorcia has also completed numerous other rehabilitative courses and undertook institutional employment during his imprisonment. (*See* Exhibit Y). To date, Mr. Scorcia has completed twenty-three separate courses during his imprisonment, all of which demonstrate his extraordinary rehabilitative efforts and his commitment to reenter his community as a positive contributor. He excelled in these 23 courses and received above average grades in all of such endeavors.[10]

---

[10] There were four courses completed by Mr. Scorcia in which certificates were not provided. These courses include: a) Entrepreneurship which was a one (1) day, two-hour course that was completed on March 3, 2020; b) The Finance Pre-Trial Course which was a twelve-hour course over a ten-day period that was completed on March 13, 2020; c) The Pre-Trial Math Course which was completed on March 19, 2020; and d) The Alternative to Drug Dealing Course. (*See* Exhibit Y).

Additionally, Mr. Scorcia worked during his imprisonment, and received excellent work performance ratings. (*See* Exhibit Y). He was granted the position of unit orderly on his floor because of his good qualities and ability to fulfill the duties associated with such position. Mr. Scorcia was given an outstanding rating in every category by his supervisor, Counselor Vega, who noted:

> "Inmate Scorcia is an outstanding orderly. Inmate Scorcia performs his duties with little to no supervision. Inmate Scorcia assists other inmates in their duties in addition to his own. Inmate Scorcia is an outstanding orderly who works well with others. He is well organized, dependable, timely, and always brings a positive attitude to his work."

Notably, Mr. Scorcia engaged in these efforts and maintained a positive attitude despite the harshness of his confinement and the fact that he was unable to see his wife and children since the pandemic-based lockdowns began at the MDC in March 2020. Indeed, notwithstanding all the negative variables associated with his imprisonment, Mr. Scorcia embarked on an extensive and extraordinary rehabilitative effort and has taken every available course at the MDC to self-better himself. He has also accepted orderly work in his unit and has done outstanding in his overall work performance.

Accordingly, Mr. Scorcia's outstanding work performance and his extensive rehabilitative efforts warrants serious consideration by the Court in the determination of an appropriate sentence and provides a very compelling basis for the imposition of a sentence of twenty-seven (27) months incarceration.

## VI.     The Harsh Conditions of Mr. Scorcia's Pretrial Imprisonment

Mr. Scorcia's harsh and long pretrial imprisonment not only relates to 3553(a)(2), but also it provides a compelling basis for the Court to impose the requested sentence of 27-months imprisonment (even if it was to adopt the advisory Guidelines range provided in the plea agreement of 37-46 months). *See, e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States*

*v. Behr*, 2006 WL 1586563, at *5 (S.D.N.Y. 2006); *see also United States v. Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account . . ."); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs); *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis*, 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), citing *United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

The MDC conditions have been continuously harsh this past year to present, mostly requiring all inmates to be confined to their cells for 24 hours a day in units full of desperate and sick inmates. Because of short-staffing and a lack of available healthy inmates to work the units, the condition of confinement within the facility during the pandemic was horrific. *See, e.g., Stop the Coronavirus Outbreak at Brooklyn's Federal Jail*, NY Times, (Dec. 8, 2020); Jane Wester, *Lawyers 'Terrified' to Return to Brooklyn's MDC Amid COVID-19 Outbreak*, N.Y. Law Journal, (Dec. 4, 2020); Noah Goldberg, *Brooklyn Federal Jail Holding Ghislaine Maxwell Has COVID Outbreak*, NY Daily News, (Dec. 3, 2020).

At the outset of the COVID-19 outbreak, the MDC failed to meet the most basic recommendations of the CDC for preventing the spread of the disease. Inmates were not even provided basic items, masks, or able to socially distance. Indeed, most inmates were double bunked in a single cell, sharing a toilet and sink with a cellmate and a common shower with at

least sixteen other people. In addition, commissary was routinely closed, and the distribution of soap was limited. Medical attention was and remains suspect at this facility. At the outset, inmates with serious medical conditions, such as AIDS and anemia, reported being denied medications and/or proper medical care. *See, e.g.,* National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016, at https://bit.ly/39JRhdW.  At other times, no clean drinking water was provided to inmates, and they were forced to drink from their bathroom sinks (which largely provided only dirty and brownish running water).

In addition to the mental and physical trauma caused by the extremely difficult conditions within the facility, inmates and their families were also traumatized by repeated reports that the COVID-19 was increasingly more transmittable and deadly within prisons. *See* Eric Levenson, *Prison inmates are twice as likely to die of Covid-19 than those on the outside, new report finds*, CNN (September 4, 2020)*;* Jane Wester, *Legal Aid Sues for Release of 116 NYC Inmates, Saying Coronavirus Mitigation 'Virtually Impossible' in Jails*, NY Law Journal (March 20, 2020) ("Continuing to incarcerate people who have been deemed by the CDC to be especially vulnerable to a deadly pandemic, in conditions were taking the only known steps to prevent transmission are virtually impossible, constitutes deliberate indifference to serious medical harm in violation of the United States and New York State constitutions"); *United States v. Gross*, No. 15-cr-769 (AJN), 2020 U.S. Dist. LEXIS 60554, 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020) ("Individuals in carceral settings are at a '*significantly higher*' risk of spreading infectious diseases."); *United States v. Nkanga*, No. 18-cr-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("Those detained in…prisons face particularly grave danger [related to COVID-19].").

While it would be impossible for undersigned counsel to truly capture the reality of the chaotic and horrible prison environment in which Mr. Scorcia and other inmates were subjected to during this past year at the MDC, the following timeline has been created by counsel to best illustrate some of the extremely difficult conditions endured by Mr. Scorcia to date:

- **<u>March 2020</u>**

    In March 2020, the Federal Bureau of Prisons began to implement measures to deal with the COVID-19 pandemic, which significantly impacted inmate movement, "privileges" and housing at the MDC. At this time, the entire facility, including where Mr. Scorcia was housed, went largely into full lockdown mode (i.e., 24-hours per day), especially after active COVID-19 cases were detected on the 4th and 5th floor. Notwithstanding the projected trajectory of the virus, inmates had very little protection to prevent the spread of the virus, testing was suspect and the conditions at the facility were unsanitary (i.e., inmates had access to "brown" and dirty sink water). All social and legal visits were suspended, and inmate movement was halted. Access to means of communication, hot meals, and showers were generally non-existent.

- **<u>April 2020</u>**

    In April 2020, the 24-hour lockdown continued. On Mondays, Wednesdays, and Fridays between April 1-14, inmates on Mr. Scorcia's floor were allowed out of their cells for only thirty (30) minutes per day. During that 30-minute period, inmates were expected to take a shower and permitted (if possible, within the same timeframe) to make one (1) phone call and/or send an email to their family and counsel. Notably, the showers and four (4) phones available on each floor had to accommodate all inmates in the unit (which accounted for 72 inmates in Mr. Scorcia's unit) and were simultaneously in use by the inmates without disinfection. Mr. Scorcia was required to wait his turn for use of the phone in order to make the one (1) brief call to his family to let them know that he was well.

    On Tuesday, Thursdays, Saturdays, and Sundays, inmates were not allowed outside of their cells and remained in 24-hour lockdown. To this end, Mr. Scorcia was allowed outside his cell for a total of ninety (90) minutes in a 168-hour week. He was only permitted to take three (3) brief showers per week and make three (3) telephone calls/emails during the same time he was outside his cell.

    On April 15, 2020, the MDC notified all inmates that the lockdown at the facility would continue until May 20, 2020. Notwithstanding the surge of positive cases in the surrounding community and amongst staff, the MDC reported, as of April 28, 2020, to testing only 13 inmates. It was further reported that six inmates and thirty staff members tested positive. In this regard, there was a tremendous risk of exposure to the inmate population and a high degree of stress in their trying to avoid contracting the disease (while also dealing with the stress of their federal prosecution and worrying about their family to which they had limited contact).

- **May 2020**

    In May 2020, the lockdown status continued at the MDC. All inmates, to include Mr. Scorcia and those in his unit, were confined to their cells, with the same limited ability to shower and use the phone/email three (3) times per week for 30 minutes. All bans on social and legal visits remained in effect.[11]

    Furthermore, on May 29, 2020 (at 5:15pm) there was a power outage at the facility. There were no lights, and the air conditioning system was shut down. Mr. Scorcia and other inmates remained in their cells in the dark and excessive heat. Inmates were screaming throughout the night because of the excessive heat and darkness. The lockdown and heat also exacerbated the unsanitary conditions at the facility, as there was an extended period of time in which the trash was not removed within the units. There existed a smell of decomposing garbage which seeped into inmate cells. Also, inmates in the unit screamed and banged on the cell doors throughout the night which caused sleep deprivation for many inmates, and this ritual continued periodically throughout the lockdown as inmates conducted such acts in protest of the horrible conditions of their confinement.

- **June 2020**

    In June 2020, the MDC remained in restrictive mode not only to deal with the surging virus, but also due to social unrest amongst the community. During the first week of June (6/1/20 to 6/7/20), the facility was in a *complete* lockdown due to Black Lives Matter (BLM) protests that were occurring outside the facility.

    Notably, inmates were not permitted to take a shower for the entire week, and they received cold or half frozen box meals inside their cells which were barely edible. During this week-long lockdown, there was no laundry detail, and inmates were required to wear the same clothes for approximately ten (10) days.

    During the protests, some inmates became defiant and refused to comply with the staff demands. Staff used an excessive amount of pepper spray on the non-compliant inmates, which resulted in mist from the pepper spray seeping into the ventilation system (including inmate cells where Mr. Scorcia was housed). Many inmates, including Mr. Scorcia, were impacted by the pepper spray but received no medical assistance from the staff due to the lockdown. While there existed assistance buttons inside inmate cells, they were disconnected by the staff because of the excessive requests made by the inmates during the lockdown generally.

    Once the protests had subsided, the facility reverted back to a modified lockdown status, permitting inmates to resume the three (3) showers per week regimen. Nevertheless, it took several days at staggered intervals to be eligible to take a shower, and inmates were required to reuse soiled clothes due to the laundry activities being previously halted.

---

[11] The inmates were not permitted to participate in any recreation, and there were no religious services whatsoever since the services were closed.

On June 8th, the MDC instituted further restrictions on the modified lockdown, permitting only a few inmates to be removed from their cells at a time, because of reported altercations amongst inmates to use the telephone during the strict thirty (30) minute release time.

On June 28, 2020, Mr. Scorcia's entire unit was searched for cell phones and weapons. The inmates were placed in two (2) separate rooms without masks. There were 35 inmates in one (1) 10x20 room and 30 inmates in another 25x30 space. All of Mr. Scorcia's personal items in his cell were destroyed. Any food items that were in his cell were opened and poured on the cell floor. After the extensive search by staff, the inmates were locked back inside their respective cells.

The inmates were still only allowed ten (10) minute showers, three (3) times per week and the water would automatically shut off even if the inmate's shower was not completed. If an inmate failed to comply with the directive, he would then be placed in the segregated housing unit (SHU).

Finally, by the end of the month, several inmates working in the kitchen tested positive for COVID-19 and were subjected to quarantine. As a result of the quarantine, the inmates endured a minimum of seven (7) weeks of frozen meals.

- **July 2020**

In July 2020, the 24-hour lock downs continued, and the inmates were fed cold, partially frozen, box lunches three (3) times per day. Mr. Scorcia was not permitted to take a shower until July 10, 2020. He was given three (3) hours outside of his cell with 45 other inmates in the unit. None of the inmates were given masks or hand sanitizer and there was no social distancing between inmates. The telephones were and continue to be a source for spreading germs and were not cleaned or wiped down following each inmate's usage.

- **August 2020**

In August 2020, the lock down of the facility continued. All inmates were under a 24-hour lockdown from August 1-5, without access to a shower, telephones, emails, etc.

The inmates in Mr. Scorcia's unit were allowed outside their cells on a staggered basis on August 7th and 8th to take one, 10-minute shower. The inmates were then locked back inside their respective cells.

Notably, between August 2-5, the facility did not have enough food for the breakfast meals to feed the entire unit. Some of the inmates in the unit protested loudly and were very upset for not being provided breakfast during this time period.

On August 10, 2020, Mr. Scorcia was allowed out of his cell for one hour and allowed outside his cell for two (2) hours on August 11, 2020.

On August 15, 2020, the Warden notified the inmate population that the water in the cells will be shut off from 10:00pm until 2:00am for maintenance purposes. The Warden indicated that bottled water would be provided to the inmates in their cells, however, the water was never provided.

For the remainder of the month, Mr. Scorcia and his unit were locked in their cells from August 26-30 for 24 hours per day. On August 31, 2020, Mr. Scorcia was allowed outside his cell to take a ten-minute shower. He was required to put the same clothes on that he was wearing for the past four days following the 10-minute shower.

- **September 2020**

    During the first week of September 2020, the lockdown at the facility continued. On September 8th, the lockdown was temporarily lifted in Mr. Scorcia's unit. However, on September 13, 2020, the full lockdown was reinstated.

- **October 2020**

    In October 2020, the lockdown at the facility continued. Mr. Scorcia was confined to his cell with the exception of acting as an employee in the unit and participating in certain courses offered at the facility.

- **November 2020**

    In November 2020, the lockdown at the facility continued. Mr. Scorcia was again confined to his cell with the exception of acting as an employee in the unit and participating in certain courses offered at the facility.

- **December 2020**

    In December 2020, the lockdown at the facility continued, including during the holidays. In addition to restricting inmate use of the telephones and emails, prison mail was substantially delayed for unknown reasons (taking approximately two (2) weeks for an inmate to receive a piece of mail once it arrived at the facility).

- **January 2021**

    In January 2021, the lockdown at the facility continued. A significant outbreak of the COVID-19 virus was also reported amongst the inmate population.

    On January 25, 2021, Mr. Scorcia tested positive for the virus. On January 27, Mr. Scorcia was moved from the quarantine unit to the isolation unit. As a result of contracting the coronavirus, Mr. Scorcia experienced chills, loss of taste and smell, body aches, significant lung congestion, shortness of breath, and a weakened state. At certain times, Mr. Scorcia also reported coughing up blood. Notwithstanding being in such condition, Mr. Scorcia received no medical treatment in the first eight (8) days of his reported illness, and it took more than a week for him to receive a dose of aspirin. He remains dealing with the aftereffects of the virus.

In short, the harsh conditions suffered by Mr. Scorcia at the MDC are far beyond any appropriate civilized punishment. For most of the past year, Mr. Scorcia has been confined to a small cell, being let out only for a few hours a month to briefly shower and communicate with his

family. By all accounts, Mr. Scorcia's 17-months of imprisonment was overwhelmingly severe and should account for far more than 17-months of imprisonment during "normal" prison circumstances. *See, e.g., United States v. Garcia*, 2020 WL 7212962, at *3 (S.D.N.Y. Dec. 8, 2020) (Prison sentences served during the pandemic, like here, "mak[e] the conditions of confinement harsher, both physically and psychologically, than they would normally be," given the constant lockdowns and other restrictions, and perhaps "enhance the deterrent effect of prison.").

Ultimately, many courts have recognized that consideration must be afforded to inmates like Mr. Scorcia that have suffered harsh terms of imprisonment during the COVID-19 pandemic, because "a day spent in prison under the conditions occasioned by the pandemic is not equivalent to an ordinary such day." *United States v. Harris*, 2020 U.S. Dist. LEXIS 179257, at *10-11 (S.D.N.Y. Sep. 29, 2020). Accordingly, the Court should account for Mr. Scorcia's uniquely harsh term of imprisonment and the physical and mental strain that was placed on him and his family during this time and impose the requested sentence of 27-months imprisonment.

## VII. The Court Should Reject the Sentencing Recommendation of Probation and Scrutinize the Offense Narrative Provided in the PSR

The Court should both reject Probation's sentencing recommendation of 60-months incarceration and carefully scrutinize the offense narrative contained in the PSR, because (1) an upward departure is not warranted here based on all mitigating factors already discussed herein and (2) Probation's recommendation and offense narrative appears premised on information that was supplied by the government that is arguably in breach of the controlling plea agreement.[12]

---

[12] Aside from these significant defects, Probation's recommendation glaringly takes no account for the harsh conditions of Mr. Scorcia's pre-trial confinement or his extraordinary rehabilitative efforts during such time, and it far exceeds the defense's proposed Guidelines range of 27-33 months, the Guidelines range provided in the plea agreement of 37-46 months, and the Probation Department's own calculations as set forth in the PSR.

To be sure, Probation's recommendation appears to principally rely on the hyperbolic offense narrative it admittedly constructed with the government and inaccurate claims that Mr. Scorcia used physical violence (and threats of the same) against the alleged victims, that he possessed firearms and other weapons in furtherance of the offense, and that he loaned hundreds of thousands of dollars to more than ten victims. *See* Letter of Probation to Hon. Brian M. Cogan, dated January 27, 2021 ("Although the presentence report is nearly complete, the Probation Department is attempting to complete a thorough offense narrative detailing the entire conspiracy. The Probation Department is working with the Government to complete the narrative.").

However, the concessions made by the government during plea negotiations, along with its *Brady* disclosures and the defense's independent investigation of the offense conduct, provides that none of the reasons proffered by Probation are properly advanced nor warrant an enhanced sentence here. In this regard, the Court should reject considering Probation's recommendation and scrutinize much of the hyperbolic narrative contained in the PSR to ensure that the government is not able to use Probation as an end-run around the plea agreement it executed with Mr. Scorcia. *See* Plea Agreement, at 5-6, ¶ 5c (the Government agrees to "make no motion for an upward departure under the Sentencing Guidelines.").

Indeed, it is well established that in the context of plea agreements, the Court must undertake measures to ensure that the government is held to "'the most meticulous standards of both promise and performance,'" *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999), because "plea bargains require defendants to waive fundamental constitutional rights." *United States v. Vaval*, 404 F.3d 144, 152- 53 (2d Cir. 2005). To this end, the government must meticulously honor all aspects of its bargain, and it may not implicitly seek an outcome for which it agreed not to advance. *See, e.g., United States v. Canada*, 960 F.2d 263, 268-69 (1st Cir. 1992) (The government is not

permitted to implicitly repudiate the assurances it made when plea bargaining, so as to pay "lip service" and make "end-runs around" its promises); *United States v. Thompson*, 403 F.3d 1037, 1039 (8th Cir. 2005) (finding that prosecution's acceptance of Probation's certain recommendations out of "an obligation to advise the Court of what the facts are" breached the plea agreement); *United States v. Boatner*, 966 F.2d 1575, 1578 (11th Cir. 1992) (government breached by providing information inconsistent with agreement terms).

Here, it appears that many of the prejudicial, inflammatory and claimed aggravating reasons presented in the offense narrative and ultimately relied on by Probation in its justification for an upward departure is based solely on information provided by the government during the construction of the offense narrative contained in the PSR. In this regard, not only is much information of the hyperbolic narrative cited by Probation for an upward departure contrary to the actual evidence, but also it does not truly align with the government's duty to *meticulously* honor its obligations under the plea agreement not to advocate for an upward departure.

For example, while the government has helped Probation complete the very offense narrative it states justifies an upward departure here, the government already negotiated with the defense that the stipulated range in the plea agreement should not include an enhancement for Mr. Scorcia having an aggravating role (§ 3B1.1(c)) in the offense, and that the acts in which Mr. Scorcia admitted would not include an enhancement for an "express or implied threat of bodily injury" (2B3.2 (b)(1)).[13] Yet, Probation's current recommendation, based on its discussions with the government about the offense conduct, now presents those very same factors in the offense

---

[13] Mr. Scorcia's guilty plea was also jointly constructed to ensure that the threat of economic harm (not physical injury) was the basis to satisfy the elements of the instant offense (*see supra*, at II).

narrative and as a basis to upwardly depart.[14] *See* PSR at 8, ¶ 21 (noting that Scorcia used threats of bodily harm against the alleged victims).

In addition, Probation's recommendation inaccurately claims, apparently at the government's nudging, that Mr. Scorcia possessed firearms and weapons in furtherance of the offense conduct. However, the government extended coverage to Mr. Scorcia for the two (2) weapons recovered by law enforcement from his residence because it was aware that the weapons were not used in connection with the instant offense. (*See* Plea Agreement, at 5-6, ¶ 5a). Yet, notwithstanding that fact, Probation still errantly submits "[h]e also possessed and carried weapons," PSR, at 8, ¶ 22, and, again evidencing a possible breach of the controlling plea agreement, it attributes that claim solely to the government. *See* PSR, at 5, ¶ 3 (noting the government has advised Probation of Scorcia's involvement in unindicted racketeering conduct of criminal possession of a weapon).

Nevertheless, there is no evidence whatsoever that Mr. Scorcia ever possessed a weapon in furtherance of the offense conduct. The true facts reveal only that on June 5, 2019, a search warrant was executed at Mr. Scorcia's home that yielded two (2) unregistered weapons, along with an adjustable metal baton were seized. In this regard, other than the discovery of such items, there is no evidence whatsoever to support Probation's catapulting claim that such instrumentalities were actually used in the instant offense and it glaringly cites none.

Ultimately, it appears that the government has provided Probation with a hyperbolic narrative of the offense, and in doing so, it has arguably breached its obligations by trying to utilize Probation as a conduit for seeking an outcome in which the plea agreement prohibits it from

---

[14] It is no coincidence that those enhancements (which the parties negotiated should not be included) would have provided for a range of imprisonment of 51 to 63 months, which is now Probation's exact recommendation.

directly requesting. *United States v. Palladino*, 347 F.3d 29, 30 (2d Cir. 2003) (The government's actions must comport with not only the agreement's letter, but also its "spirit."); *Canada*, 960 F.2d at 270 (noting the government breached when it "took away with the left hand what [it] had given with the right"); *Vaval*, 404 F.3d at 153 (the government cannot claim as a defense that it "did not intend to violate" an agreement's provision that it not seek an above-Guidelines sentence where "in fact what was said constituted an argument about where within the range to sentence appellant and/or whether to upwardly depart.").

Accordingly, the Court should reject considering Probation's recommendation, and closely scrutinize the offense narrative to ensure that any potential breach by the government does not ultimately prejudice Mr. Scorcia and/or impact the sentence imposed to his disfavor. *See, e.g., United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999) (Given the government's inherent advantages in bargaining power, its behavior at sentencing must be closely "scrutinize[d]" to "ensure that it comports with the highest standard of fairness.").

In addition, the Court should reject Probation's recommendation because the claimed aggravating reasons it provides for an upward departure (i.e., use of physical violence, possessing a firearm in furtherance of the offense, more than 10 victims, etc.,) are also not supported by any evidence and are actually contrary to both the government's *Brady* disclosures' and the defense's investigative findings.

For example, while Probation admits that it has not actually spoken to any of the alleged victims (*See* PSR at 22, ¶ 57), it asserts that an upward departure is warranted based on the inaccurate premise that Mr. Scorcia used physical violence and threats of violence to extort his victims. Yet, there is no known evidence that actually supports Probation's proffer, and all the disclosed evidence actually demonstrates that no physical violence (or communicated threats of

violence) was ever used by Mr. Scorcia against the alleged victims. In fact, the government's *Brady* disclosures, along with the independent witness interviews conducted by the defense, proves this point. Indeed, in its *Brady* disclosure, the government itself admitted "that certain individuals…, advised that Scorcia did not threaten them during the period in which they had outstanding loansharking loans with him." The government further noted,

> certain individuals, including ███, ███, and ███, advised that Scorcia did not threaten them during the period in which they had outstanding loansharking loans with him;
>
> ***
>
> that while Scorcia recounted…that a debtor was in "tears" and suggested that Scorcia had hit the debtor [when Scorcia described what followed the debtor's pleas of "No, please, T [referring to Scorcia]" as "Boom!"] and the government believes, based on information obtained to date, that in that April 30, 2019 conversation Scorcia was referring to ██████, ███ has denied that Scorcia threatened him or Scorcia hit him (although he conceded that he thereafter started to make regular payments to Scorcia).

Exhibit Z, at *3-5 (*Brady* letter (6/10/2020)).

Likewise, Probation also incorrectly asserts (again, without any evidentiary foundation) that an upward departure is justified because Mr. Scorcia lent hundreds of thousands of dollars in loans charging exorbitant interest rates. [15] *See* PSR at 8, ¶ 20; 22-23, ¶ 58. Incomprehensibly, while Probation presents such a hyperbolic generalization of the offense conduct as an aggravating circumstance to warrant an upward departure, it simultaneously admits to the Court that it has no information to calculate the actual loss for restitution purposes and that it has not spoken to any of the alleged victims. *See* PSR at 38, ¶ 196. Perhaps most troubling, Probation also admits that the

---

[15] Probation's characterization appears to be a blind adoption of the government's initial arguments that it presented to support Mr. Scorcia's pretrial detention, which has since gone unverified and remains without supporting discovery productions (i.e., government arguing to Magistrate Judge Vera M. Scanlon that Mr. Scorcia "has been extraordinarily active in both promoting his own loansharking business in connection with which he has thousands of dollars out on the street…" Exhibit Z, at *1-2).

government has refused to provide the contact information for the various victims in this case so that Probation can independently verify such claims.[16] (*See id*; 22, ¶ 57). Accordingly, the fact that Probation is advancing unverified and unsupported claims as a basis for the Court to upwardly depart from the Guidelines range further demonstrates the possibility of the government's breach and it reduces Probation's independence here.

In addition, Probation's recommendation should be rejected because it is further undermined by its errant assertion that there are more than ten victims of Mr. Scorcia's loansharking conduct. However, Count One, which is the Racketeering Count in the indictment, involves only seven (7) different John Doe's, which are explicitly named as follows:

- Racketeering Act 1 (RA1) – John Doe #1 (July 2014 and June 2019)
- Racketeering Act 2 (RA2) – John Doe #2 (2015 and June 2019)
- Racketeering Act 3 (RA3) – John Doe #3 (2015 and June 2019)
- Racketeering Act 10 (RA10) – John Doe #9 (January 2019 and May 2019)
- Racketeering Act 13 (RA13) – John Doe #11 (March 2019 and May 2019)
- Racketeering Act 14 (RA14) – John Doe #12 (March 2019 and July 2019)

Thus, Probation's exaggerated narrative about the number of alleged victims is not only unavailing as a matter of fact, but also moot since the advisory Guidelines range it has provided in the PSR already accounts for these same acts (therefore, the recommended upward departure is improperly based on facts already accounted for by the advisory Guidelines range). *See, e.g., United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007).

Finally, Probation's recommendation for an upward departure incorrectly indicates that, although the plea agreement calculates eight (8) total units (which results in a five (5) level increase

---

[16] The defense has long requested that the government provide specific information regarding the loan amounts, the interest rates, and amounts allegedly paid by the debtors on the above loans. The government has refused to provide this information. (*See* Exhibit Z, at *3-5).

in the guideline level (*See* U.S.S.G. §3D1.4)), there exist multiple other counts against Mr. Scorcia that would reflect a 12 unit increase in the offense level. In making this leap, Probation improperly utilizes the claimed uncharged conduct and non-Rico counts as racketeering acts, implying that there would exist an even greater offense level but for the limits of U.S.S.G. Section 3D1.4.[17]

Notably, however, U.S.S.G. Section 3D1.4 allows for a maximum increase of five (5) levels if the number of Units added are more than 5. The United States Sentencing Commission determined that a five (5) level increase should be the maximum allowable increase in levels. The Commission also indicates a departure would only be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 Units. The units outlined in the plea agreement are eight (8) units, and this case is not unusual which would warrant an upward departure and would result in an excessive increase in Mr. Scorcia's sentence.

Additionally, the multiple racketeering acts analysis as outlined in the plea agreement has taken into count the racketeering acts that Mr. Scorcia did not plead guilty to in connection with U.S.S.G. §3D1.4. The government is still required to prove the other racketeering acts by a preponderance of the evidence even though they are included in the racketeering act analysis.

The extortionate extension of credit guideline pursuant to U.S.S.G. section 2E2.1 is assigned a base offense level of 20. There are a number of aggravating factors incorporated into the loansharking guideline that allow for an increase in the guideline range which would increase

---

[17] For example, Probation classifies the weapons found in Mr. Scorcia's home as a class A misdemeanor under NYS Penal Law section 265.01 (*See* PSR, at 24, ¶ 65), and it then creates its own Uncharged Racketeering Act 3, under Count One, claiming that the offense level is not being determined by the underlying racketeering activity. The reasoning advanced by Probation is that the conduct has an offense level below level 19. (*See* PSR, at 24, ¶ 65). However, the true reason is that the weapons were not used in connection or in furtherance of the Racketeering Count (Count One).

a defendant's sentence.   These enhancements would include: discharging, brandishing or possessing a weapon in connection with the offense, bodily injury, serious bodily injury, or permanent bodily injury, abduction, physical restraint and other enhancements as well.   It is important to note that none of these enhancements apply to Mr. Scorcia (as not only the facts dictate, but also as a result of the parties' agreement in resolving this matter).

The advisory Guideline range for loansharking in Mr. Scorcia's situation is computed at a level 20 minus three (3) points for acceptance of responsibility—equaling an adjusted level of 17 with an advisory Guidelines range of 24-30 months for a defendant with a Category 1 criminal history. And no matter how much maneuvering of the facts is done by the government through Probation now, it has entered into a binding agreement that Mr. Scorcia's advisory Guidelines range is at most 37-46 months (taking into account all relevant facts and in light of the multiple racketeering act analysis as provided in the plea agreement).

Ultimately, there is nothing unusual or exceptional here that takes Mr. Scorcia's case out of the "heartland which the Commission intends individual Guidelines to apply.'" *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (quoting *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007).   In fact, Mr. Scorcia's conduct is fully accounted for by the advisory Guidelines analysis, and Mr. Scorcia's case is not "different from the ordinary situation covered by the [G]uidelines calculation." *Sindima*, 488 F.3d at 87.

Indeed, the Court's consideration of all of the relevant facts and mitigating factors (to include Mr. Scorcia's uniquely harsh pre-trial imprisonment and his extraordinary rehabilitation) overwhelmingly counsels for its imposition of a sentence of 27-months imprisonment in order to achieve the aims of the 3553(a) sentencing factors.

## CONCLUSION

Based on the foregoing, we respectfully submit that a sentence of 27-months imprisonment—with three years of supervised release, $75,000 forfeiture, and a $100 mandatory special assessment—is sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

Respectfully submitted,

*/s/ Vincent Romano*
Vincent J. Romano, Esq.
9201 4th Ave, Ste. 4
Brooklyn, NY 11209
(718) 852-5200
vromano13@aol.com

*/s/ Anthony DiPietro*
Anthony DiPietro, Esq.
Law Offices of Anthony DiPietro, P.C.
15 Chester Avenue
White Plains, NY 10601
(914) 948-3242
Dipietrolaw@yahoo.com

*Attorneys for Defendant*
*Thomas Scorcia*