

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EAG
F. #2018R01021

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 19, 2021

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Thomas Scorcia
       Criminal Docket No. 19-442 (S-1) (BMC)

Dear Judge Cogan:

  The government respectfully submits this letter in connection with sentencing of the defendant Thomas Scorcia and in response to the defendant's sentencing memorandum, filed on February 26, 2021, and his objections to the Pre-Sentence Investigation Report ("PSR"), prepared on February 16, 2021.[1]  Sentencing is currently scheduled for April 5, 2021.  In his memorandum, the defendant seeks a sentence of 27 months' imprisonment.  For the reasons described herein, the government respectfully asks the Court to impose a sentence within the applicable Guidelines range, which the government submits are likely to be 37 to 46 months' imprisonment.[2]

---

[1] The defendant's objections were set forth in a letter dated February 28, 2021.  The government understands that the defendant no longer maintains that the government has breached the terms of the plea agreement, as he suggested in his sentencing memorandum, and therefore the government has not responded to that allegation herein.  In addition, the government understands that the defendant does not seek Fatico hearing with respect to the objections to the PSR and agrees that the Guidelines range found by the Probation Department applies.

[2] Assuming that codefendant Joseph Amato, Jr., pleads guilty on March 22, 2021, as he is scheduled to do, the government will ask the Court to grant one-level reduction

BACKGROUND

I.  The Defendant's Membership in the Colombo Organized Crime Family

According to multiple witnesses and as alleged in the indictment, the defendant Thomas Scorcia is an inducted member of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"), who as of his arrest in October 2019 reported to Joseph Amato, a captain in the Colombo family. In becoming an inducted member, Scorcia swore allegiance for life to the crime family above all else, even his own family.

Significantly, communications about Scorcia and another individual's ("CC1") induction ceremony (believed to have taken place on December 11, 2018) and the fact of Scorcia's induction were intercepted over Amato's and Scorcia's cellular telephones. For example, on October 12, 2018 (JA1 #343), Amato called CC1 and told him that he could not say no to Amato's invitation to meet him because "you never know what I mean[,]" a reference to the fact that their next meeting could be his induction in the crime family. CC1 received that call on or about December 10, 2018, when Amato called CC1 and told him (JA1 #4425):[3]

> You still (UI[4]) about that job tomorrow morning right? … Yeah okay, so meet me by my (UI) about nine. … Alight he told you what tools to bring and everything right …. Alright very good, we will look at it and if it's good then you know we will go sign a contract, alright.

Later that day, Amato called him again (JA1 #4494),

| | |
|---|---|
| Amato: | You should go to bed early. Did you press your clothes? |
| CC1: | Yep. |
| Amato: | You're gonna look like Barzini or what? |
| CC1: | (laughing) Barzini. |
| Amato: | Barzini, I'll see you by my mother's around 9. |
| CC1: | You got it. |

---

in light of a global resolution and the applicable Sentencing Guidelines range will be 37 to 46 months.

[3]  Intercepted communications are assigned a particular session number. Telephone calls and text messages intercepted over Amato's two cellular telephones are identified as "JA1 #" and "JA2 #"; telephone calls and text messages intercepted over Scorcia's six cellular telephones are identified as "TS1 #," "TS2 #," "TS3 #," "TS4 #," "TS5 #," and "TS6 #"; and telephone calls and text messages intercepted over Amato Jr.'s cellular telephone are identified as "JAJ #."

[4]  "UI" is an abbreviation for "unintelligible."

2

Barzini is a reference to a fictional character in the movie, "The Godfather." The following day, law enforcement surveilled Amato, Scorcia and CC1, all of whom were dressed nicely, entering Café Di Giorno in Brooklyn, and then Panino Perfetto, where they remained for a few hours and where Scorcia and CC1 are believed to have been inducted into the crime family.

In subsequent telephone conversations between Amato, Scorcia and others, including one in January 2019, Scorcia and Amato repeatedly referenced Scorcia's induction. For example, on January 12, 2019 (TS1 #212), Amato commented, "Yeah, I'm curious tonight with Fanucci," a reference to an inducted member from another crime family. Scorcia then sheepishly said, "Yeah, well, you know, like I says, uh, he knows that you. You don't think he don't know? Of course, he knows," and Amato responded, "A hundred percent. I don't think he'll go there. He may give you a wink or something. You know what I mean?"

In a telephone call between Amato and Scorcia on March 18, 2019 (TS3 #2388), in which Amato and Scorcia discussed a funeral for the former official boss of the Colombo family, Scorcia commented, "I ordered a charcoal grey suit, something new. I don't want to be like a stumble bum like everybody else. I represent you. This way we'll be nice and sharp." In that same call, Scorcia also jokingly asked Amato, after Amato suggested that Scorcia and codefendant Daniel Capaldo, another Colombo soldier, drive the one-time boss's body back to New York, "Do I move up in the ranks?" Scorcia's comment reflected his status as an inducted member who had the potential to move up in the crime family hierarchy.

In a telephone call with Joseph Marra on April 1, 2019 (TS4 #1163), Scorcia made a comment about an individual who had "got signed up" and "got his union card," referring to the individual's induction as a member of an organized crime family. Thereafter, Marra said, "Yeah, they were telling me, uh, sometimes, ya know, once you get that union card, everything behind ya gotta go," and Scorcia answered, "Yeah, I know. I heard that too, but I pursued it and it worked out fine," which suggests that Scorcia had also received a "union card," i.e., he had been inducted. In a telephone call on May 18, 2019 (TS6 #3461), Scorcia told another individual, "Does he know what I am? Or does he still think I'm the same person from a couple years ago," a reference to Scorcia's relatively new status as an inducted member of an organized crime family. In another telephone call, this one on May 8, 2019 (TS5 #3480), Scorcia and another individual (who is not himself a crime family member) joked about a third person. Scorcia bragged, "He thinks he's the mob guy," all but openly admitting to a non-member his own status in the mob. Finally, on June 5, 2019 (TS6 #2626), the day that law enforcement searched Scorcia's residence, Amato, referring to law enforcement, commented, "They definitely know that you, you know, your situation changed, you know what I mean?" In so saying, Amato was making clear to Scorcia his belief that law enforcement tends to focus its scrutiny on inducted members of the crime family and assuring Scorcia that law enforcement knew about this change in status, i.e., Scorcia's induction.

3

II.    The Defendant Took Extensive Steps to Evade Detection by Law Enforcement and Promote the Efforts of the Colombo Family

Scorcia made extensive efforts to avoid detection by law enforcement. Specifically, Scorcia procured new, prepaid cellular telephones for Amato, Daniel Capaldo (who also reported to Amato) and himself on a monthly basis (requiring law enforcement to continually identify the new phones and obtain authorization to intercept those communications). In addition, and as described in part below, Scorica tried to use code – often plumbing terms – to avoid detection by law enforcement in the event (as it was) that his telephones were wiretapped.

III.    The Defendant Had Access to Weapons

The defendant also had access to weapons and kept them in close proximity for ready use. In June 2019, when law enforcement searched Scorcia's residence, they found, among other items, two firearms, both of which were operational. Within a covered compartment in the trunk of Scorcia's vehicle, they found tools of Scorcia's trade: an adjustable steel baton, a ski mask, binoculars and gloves to conceal fingerprints and a book on LCN. Exhibit A is a photograph of the items seized from Scorcia's trunk.

IV.    Overview of Racketeering Acts

Scorcia pleaded guilty to one count of racketeering. The racketeering offense in which the defendant participated involved predicate racketeering acts relating to nine victims of extortion.

   A.    Extortion of John Doe #7 and John Doe #8

In December 2018, three family members (a father, a son and the son's cousin) were threatening to physically hurt a close friend of codefendant Joseph Amato Jr. (the "Friend") if the Friend did not make a timely payment on an outstanding gambling debt. On January 5, 2019, at the direction of Amato and others, the Friend lured two of the family members, the father and son, to a meeting place by telling them that he was going to pay them. Instead, Scorcia and Capaldo, among others, accosted them and made clear to them that they would not be receiving repayment of the debt.

In one call after it occurred on January 5, 2019, Amato Jr. told his father, Amato (JAJ #5042), "They got here they thought they were cowboys and the second (unintelligible) got there they were like church mice. … The second when they got here you know they thought they were nuts and then when we popped out they were like church mice tails between their legs okay no problem no problem." Scorcia and Amato Jr. also exchanged a series of text messages, making clear their pleasure at having intimidated the father and son:

| | | |
|---|---|---|
| Scorcia: | They got the message good (JAJ #5230) | |
| Amato Jr.: | How embarrassing to get abused like that infront of infront of your son that was great (JAJ #5236) | |
| Scorcia: | His son would have got knocked the f*** out (JAJ #5238) | |
| Amato Jr.: | Forget it! They knew it would be bad if they got stupid I wish he would have said something (JAJ #5240) | |
| Scorcia: | Trust me me too but he was not a butt sorry and apologetic but I just couldn't slap them but I almost seen black and I was just for the fun of It (JAJ #5242) [5] | |
| Amato Jr.: | Extremely apologetic and polite as can be lol (JAJ #5246) | |

B.  Conspiracy to Extort John Doe #10

Prior to their arrests in October 2019, Scorcia and John Doe #10 both operated lucrative loansharking businesses. In or about 2017, John Doe #10 became upset that Scorcia was operating the business in locations that John Doe #10 viewed as his turf. John Doe #10 went to Scorcia's office in Brooklyn, New York, where he assaulted Scorcia and vandalized his property, and then directed several of Scorcia's loansharking customers to stop paying Scorcia and instead only make payments to John Doe #10.

In or about January 2019, Scorcia decided to retaliate. This decision coincided with Scorcia's formal induction into the Colombo family in December 2018, described above. Scorcia enlisted several of his codefendants for assistance, including codefendants Krenar Suka, Anthony Silvestro and Albert Masterjoseph. He also expressly sought and received the approval of Amato.

First, on Wednesday, January 30, 2019, Scorcia directed one of their common loansharking customers to tell John Doe #10 that he was to no longer make payments to John Doe #10. On the evening of January 30, 2019, Scorcia and Suka went to the Woodrow Diner in Staten Island where they planned to confront John Doe #10. At 8:06 p.m. (TS2 #1442), Scorcia and Suka called Silvestro and complained that the Woodrow Diner was packed and they were concerned about carrying out the planned confrontation. For example, Silvestro proposed, "I would just wait for the kid to come out the place and grab him before he gets to the car," but Suka said, "It's packed bro, there's so many cars there, there's so many people there. … Bro, I'm telling you, Tommy [Scorcia], tell him it's fucking slammed in there right now." Scorcia echoed, "Fucking packed, people walking out with fucking kids, and like

---

[5]  Scorcia subsequently sent a text message to Amato Jr., suggesting that he wrote this message using the phone's voice to text function and that it was garbled in certain respects.

5

(UI[6]) fucking (UI)." Scorcia then lamented, "I'm fucking, I'm sick to my fucking stomach, I was just gonna walk right in there, but there's fucking people coming out with fucking families." As an alternative, Scorcia offered, "Horrible, he's gonna have to fucking text him, because he text him and say 'Hey I want to meet you we're gonna do something here and there or whatever' and bingo (UI) fucking pop up like that maybe tomorrow afternoon or Saturday morning." A few minutes later, at 8:37 p.m. (TS2 #1447), after Scorcia and Suka had apparently left the dinner, Scorcia and Silvestro spoke again.

> Scorcia: It's a breakfast place, I get in, I'm about to get in the car I said, "fuck it, I'm gonna go in there right now."
>
> Silvestro: And this rat really parked under the fucking cameras?
>
> Scorcia: Yeah, 150%, I said, "I'm gonna go in there right now, and walk in, I'm gonna blast the kid in the face." I says, "motherfucker."
>
> Silvestro: Yeah, yeah, yeah.
>
> Scorcia: The mother fucker, the place is packed, (UI).
>
> Silvestro: Listen, at the end of the day, you can't, fucking, cannot jeopardize the freedom for fucking some little jerkoff like that you know what I mean.

They then started to make plans for their next attempt to extort John Doe #10. Silvestro said:

> On Saturday [February 2, 2019], we shouldn't even, we shouldn't even make it a fucking song and a dance, we jump out. … Give him (UI) you send him a smack. If he raises his hand back to you, we beat the bricks off him, that's it. …That's the bottom line, we're taking his shit, you're giving him your fucking, breaking his shit, punching him and we're out of there.

Scorcia answered, "Exactly. That's what we're gonna do." They agreed to execute the plan on Saturday. Scorcia also updated Capaldo about what had happened:

> Nothing, I just pulled into Woodrow or whatever, I'm gonna head home, I'm gonna head home, and uh, it just didn't work, wasn't good to fucking do the work, you know what I'm saying? Not enough time, whatever, the valves wouldn't hold, lot of fucking people, too many people complaining they would have had no water, so it would have been really, uh, fucked up.

*** 

> You know, one of the big plumbers that I had with me, not the one you know, the other one, he didn't like it. You know, so, what the fuck was I gonna do?

---

[6] "UI" is an abbreviation for "unintelligible."

> You know? Abort the job? What would we do? We'd have to do OT on the whatever. All right, I'll talk to you tomorrow then. No worries, all good.

Scorcia, Silvestro, and Masterjoseph attempted to carry out the plan, a second time, on the following Saturday, February 2, 2019, but the plan was thwarted when they went to John Doe #10's residence and discovered he had had cameras installed that could capture their actions on a recording. At 1:15 p.m. (TS2 #2066), Scorcia called Capaldo and asked him to put Amato on the line, after which they discussed the extortion scheme in coded language referring to purported plumbing work:

> Scorcia: Oh, alright. So, hear, hear me out, the whatchamacallit, the guy that we have to do the job, off the job for, run all the lines and everything, doesn't uh, was avoiding the kid, doesn't want to meet, doesn't want to start the work, the only way he would meet the kid, to do what they have to do, would be in front of his house.
> Amato: They would only meet in front of his house?
> Scorcia: Yeah, where he's got, uh, cameras all over it.
> Amato: Yeah, alright, stupid, don't worry, don't go over his house, that's for sure, Cuz.
> Scorcia: Don't, right?
> Amato: No, no, you control the situation. Don't let him control it.
> Scorcia: Yeah.
> Amato: Alright, just leave it alone, leave it until tomorrow, we'll talk, alright.

A few minutes later, at 1:27 p.m. (TS2 #2069), Scorcia related to Suka that Amato had told him to abort the plan: "I just, uh, tried to get permission over there." Scorcia then observed, "That's ridiculous over there by the house. I don't know, but he's [referring to John Doe #10] fucking, (UI) chicken shit, he's got no balls, he's a telephone tough guy, you know that, you know."

On Tuesday, February 5, 2019, Scorcia, Silvestro and Suka tried again to carry out their plan to confront and assault John Doe #10. In a call at 12:44 p.m. (TS2 #2477), Scorcia told Silvestro, "Just give me a heads up what time, ya know, this way I can get the other gorilla to come and meet us, from the other day. … Five, 6:00 (UI) later, you tell m-, ya know, what do you think? Wanna get a little darker? Right? … We could do it right in New Dorp too 'cause that's where that kid lives." Law enforcement then warned John Doe #10 about the potential assault and John Doe #10 communicated that he had been warned to others, causing Scorcia and others to abandon their plan that night.

Notwithstanding law enforcement scrutiny, Silvestro followed through with some form of their plan after all, as evidenced by a call on February 8, 2019, at 1:33 p.m. (TS2 #2987), wherein Silvestro told Scorcia that he had instilled fear in "the kid," an apparent reference to John Doe #10:

7

| | |
|---|---|
| Silvestro: | I've got the funniest fucking video to show you when I see you. You're gonna pee your pants. |
| Scorcia: | Fuck! I spoke to my buddy, he says he'll let me know, so hopefully it won't be fucking dead. He's fucking scared, this fucking kid. You don't think so? |
| Silvestro: | Bro, you have no idea what I did to him. |
| Scorcia: | Motherfucker! Why can't I be there!?!? Motherfucker! (Laughing) Motherfucker. |

C. <u>Scorcia's Loansharking Business</u>

Scorcia operated a lucrative loansharking business, backed by his reputation as a new member and longtime associate of the Colombo family and his ties to more powerful and violent Colombo family members (<u>i.e.</u>, Amato). Scorcia lent thousands of dollars in loanshark loans. To ensure both that Scorcia could locate his debtors and that his debtors understood that Scorcia knew where they resided, Scorcia required debtors to provide copies of their drivers' licenses and their contact information. Most of the loans required the debtors to pay weekly interest payments of two to three percent per week (104 to 156% per annum) that did not reduce the principal owed. Among his debtors were John Doe #1, John Doe #2, John Doe #3, John Doe #9, John Doe #11 and John Doe #12.

To his customers, Scorcia referenced his position as an inducted member of the Colombo family. He also carried weapons although the government does not have any evidence that he ever used any of these weapons in connection with his business. As set forth above, in June 2019, when law enforcement searched Scorcia's vehicle, they found within a covered compartment in the trunk an adjustable steel baton, a ski mask, binoculars and a book on LCN.

Interception of communications over cellular telephones show that Scorcia has partners in his loansharking business. In one intercepted communication with an individual who appeared to be a loansharking customer of Scorcia ("Customer 1") (TS2 #253), Scorcia commented, "Oh buddy, you're killing me, that's fucking late (laughs) fuck. Alright, listen, you're gonna have to put it [referring to the loansharking payment] under my mat or something, or just fucking call me, T, please, I try, I-I-I like to try and, I know you're hustling, you know, you know my cutoff is like Thursday at 12 o'clock cus I have partners, but whatever you could do, listen, what are we gonna do, (stammering) you're hustling, working, (UI) I can't complain." In a text message with another individual who appeared to be a loansharking customer of Scorcia ("Customer 2") (TS2 #3713), in response to a text message saying that Customer 2 would "need until friday to give u the knock part. I have the other part today. You want to meet twice? Or everything friday?" Scorcia wrote, "Twice buddy satisfy my partner end[.]" In a text message to a third individual who appeared to be a loansharking customer of Scorcia ("Customer 3") (TS3 #3306), Scorcia wrote, in part, "i never break your balls but every other week where behind. So your gonna have to give me both weeks when you see me I have i partner an i lay out your end not fair to me lets catch. Up[.]" In a call with still another individual who appeared to be a loansharking customer

("Customer 4") (TS3 #3353), Scorcia commented, "I hate to fucking, you know, I hate to mix, I hate to doubling up shit I got Partners in it, it really really Fucks me up. I don't like that, I hate that[.]"

Capaldo assisted in financing Scorcia's loansharking business. For example, in an intercepted telephone call on January 31, 2019 (#1585), Capacldo and Scorcia had the following conversation:

Capaldo: Are you serious, or you're breakin' my balls?

Scorcia: No, I'm fuckin' serious. I got bombarded with a lot of work, uh, for this week. A lot. I thought I was finished in the middle of the week. Ya know, it would help. It's up to you.

Capaldo: Oh, what do you mean? Oh, what do you mean? The--

Scorcia: Yeah.

Capaldo: The bathroom I'm doin'?

Scorcia: The bathroom that you're doin', yeah.

Capaldo: Yeah, I'm gonna be fin-, don't worry. They're tilin' it now. I'll, I'll, you could, you could (UI)

Scorcia: No, no, no, no. Not that. For that home, my bathroom. The bathroom that we did a joint venture with, for my house. You gave me guys, you gave me guys this week, I wanted to know if you could spare another one or two for, uh, for tomorrow to get them to the house.

Capaldo: (UI)

Scorcia: Not Seguine Avenue, the other, the other b-, the other bathroom. In my house.

Capaldo: In your house?

Scorcia: Yeah. You started this week. You sent two guys the other day. I drove them over. I don't know if ya could spare another one or two.

Capaldo: (laughing) Oh boy. Alright, I'll talk to ya later. Maybe, I don't know.

Scorcia: Alright. It's fuckin' crazy. As long as ya get the tile and (UI) down and then pick it up.

9

>                   Capaldo:    Alright.
>
>                   Scorcia:    It's, uh, it's ready

In this conversation, Capaldo and Scorcia were using plumbing terms as code to discuss Scorcia's obtaining one or two thousand dollars ("spare another one or two") to lend to someone who they had previously jointly lent money to ("the bathroom we did a joint venture with, for my house. You gave me guys this week").

As set forth above, on June 5, 2019, law enforcement executed a search warrant on Scorcia's residence, vehicle and person. Among the items recovered were records consistent with the operation of a loansharking business. Among those items was a notebook that included several pages appearing to reflect outstanding loans and payments made by certain debtors of Scorcia. Significantly, on numerous pages within the notebook, "Shrek" – a reference to Capaldo - was written alongside the names of the debtors.

      D.      <u>Use of Extortionate Means to Collect an Extension of Credit from John Doe #14</u>

Scorcia and codefendant and fellow Colombo family member Vincent Scura participated in a scheme to use extortionate means to collect and attempt to collect a debt from the individual identified in the indictment as John Doe #14. In or about December 2018 or January 2019, John Doe #14 borrowed approximately $5,000 from another individual ("I-1") and, in connection with that loan, agreed to pay "3 points" or 3 percent weekly interest that did not reduce the principal owed. When John Doe #14 fell behind on making those payments in or about 2019, I-1 reached out to Scura for assistance in collecting the debt. In turn, Scura reached out to Scorcia to whom John Doe #14 also owed money and Scorcia contacted John Doe #14. Scorcia later recounted some of those discussions with John Doe #14 in calls that were intercepted over a court-authorized wiretap, as described in the PSR.

      E.      <u>Extortionate Collection of a Debt from John Doe #11</u>

Scorcia participated in the use of extortionate means to collect a debt owed by John Doe #11 and enlisted one of his associates, codefendant Albert Masterjoseph, who is large in stature and a former MMA fighter. In a telephone call between Scorcia and codefendant Anthony Silvestro, an associate of the Colombo family, on April 30, 2019 at 11:47 a.m. (#1592), Scorcia recounted to Silvestro a recent incident where he, Masterjoseph and another man who was also large in stature approached a delinquent loansharking customer in an effort to physically intimidate him and thus ensure more regular payment on outstanding loans. Further, they discussed that, during the incident, the customer expressed fear (through his tears) and Scorcia hit him.

Specifically, in the recorded conversation, Scorcia told Silvestro that one of his loansharking customers was "on track with me [Scorcia] like fucking clockwork twice a week." He then explained that although "the Lion," a reference to codefendant Dominick Ricigliano, had claimed credit for that and did tell Scorcia that he was "willing to take a ride

10

with me," Scorcia instead "took our own fucking, our friend with us." Continuing, Scorcia said, he told "Al," a reference to Masterjoseph, and "another guy, bigger than him" and that "when he [the loansharking customer] seen him pop out of the car and the other guy was opening up the door, I told the guy sit in the car, and the kid had the tears, like between me and you, like ... 'No, please, T. [i.e., Scorcia]. No.' Boom! But we'll talk about that in person. I got this kid good right now." John Doe #11 later denied to law enforcement that Scorcia had assaulted him.

F. Extortionate Collection of Credit Conspiracy

Although Scorcia and his codefendant Ricigliano had a longstanding feud due to the fact that both operated lucrative loansharking businesses and certain of their customers owed debts to both of them, beginning in March 2019, Scorcia and Ricigliano resolved their differences and joined forces to use their reputations -- as individuals capable of and willing to use violence -- to collect an outstanding debt owed by an individual. The individual had borrowed money to both Ricigliano and Scorcia, separately, and had agreed to pay each a weekly interest payment of three percent interest (amounting to 156% per annum).

DISCUSSION

I. The Defendant's Objections to the PSR

First, the defendant has advised that he no longer seeks a Fatico hearing as to Racketeering Acts One, Three, Nine, Ten, Eleven and Fourteen, and therefore agrees that the conduct should be included in the Guidelines calculation. With respect to the inclusion in the calculation of the Guidelines in the PSR of the conduct described in Counts Thirty and Thirty-One, the government agrees that it could prove the defendant's role in such conduct and its relation to the charged enterprise and therefore could have been included in the Guidelines calculation. See United States v. Ruggiero, 100 F.3d 284, 292 (2d Cir. 1996). However, because it did not include the conduct in the government's estimate of the Guidelines in the plea agreement, it does not seek for the Court do so. Moreover, the additional conduct described in Counts Thirty and Thirty-One would not affect the overall Guidelines range (given that the base offense level for each is a Level 20 and the maximum number of units have already been included in the analysis). The government also notes that it does not believe that the defendant participated in the extortion of John Doe #5 (although he discussed the scheme – after it occurred – with Amato) and the conduct should not be included in the calculation of the Guidelines. Finally, the government does not believe that the defendant's possession of firearms should be included in the calculation of the Guidelines. Among other reasons, possession of firearms is not included in the definition of racketeering activity in 18 U.S.C. § 1961(1).

The defendant objects to the statement in the PSR that the defendant possessed weapons in furtherance of the racketeering activity. The government does not have evidence that the defendant carried or used firearms in furtherance of the activity. Nevertheless, the government submits the statement is accurate as reported in the PSR and is a factor that the Court can consider under 18 U.S.C. § 3553(a). Notably, on the same day that law

11

enforcement conducted a search on Scorcia's residence, Scorcia reported the fact that federal agents searched his residence that morning to Joseph Amato (TS 7224 #2624) – the powerful captain to whom Scorcia then reported – and Amato asked, "Did they get anything else? I mean..." and Scorcia answered, "Exactly. You know what I like. Two of those." When Amato asked, "They got two of them?" Scorcia confirmed, "Yeah, a long one and a small one," referring to the two seized firearms. In context, it is a fair inference that Amato was aware that Scorcia possessed the firearms and that he knew because he did so in connection with his membership in the Colombo family.

Based on conversations with defense counsel, the government also understands that the defendant does not seek a Fatico hearing as to the remaining challenges that he outlined in his objections to the PSR and therefore the PSR need not be amended as to those statements. For clarification, the government notes that it does not possess evidence that the defendant expressly threatened any of his loansharking victims with bodily harm.[7] Rather, the defendant operated his loansharking business by relying on his reputation as a longtime associate and newly inducted member of the Colombo family and the accompanying implicit threat of bodily injury. The government understands that the defendant will not challenge the government's characterization of his loansharking business as such.

II.     The Guidelines Calculation

The government submits that the following Guidelines calculation applies and as noted above, understands that defense counsel does not seek a Fatico hearing and will not further challenge the applicability of this calculation.

R.A. 2: Extortionate Extension of Credit – John Doe #2

Base Offense Level (§2E2.1(a))                                    20

R.A. 13: Extortionate Collection of Credit – John Doe #11

Base Offense Level (§2E2.1(a))                                    20

Multiple Racketeering Act Analysis (§ 3D1.4)

---

[7] The government notes that as described above, the defendant himself recounted to a coconspirator a story that strongly suggests that the defendant used physical violence to ensure that one victim, John Doe #11, resumed marking payments. However, that victim later denied to the government that Scorcia used any such physical violence.

|   |   |   |
|---|---|---|
| Highest Adjusted Offense Level | | 20 |
| Units: | | |
| Racketeering Act 2 (§ 3D1.4(a)) | 1 | |
| Racketeering Act 13 (§ 3D1.4(a)) | 1 | |
| Racketeering Act 1 (§ 3D1.4(b)) | 1 | |
| Racketeering Act 3 (§ 3D1.4(a)) | 1 | |
| Racketeering Act 10 (§ 3D1.4(a)) | 1 | |
| Racketeering Act 11 (§ 3D1.4(a)) | 1 | |
| Racketeering Act 9 (§ 3D1.4(a)) | 1 | |
| Racketeering Act 14 (§ 3D1.4(a)) | <u>1</u> | |
| Total Units | 8 | |
| Levels Added (§ 3D1.4): | | +5 |
| Less: Acceptance of Responsibility (§ 3E1.1) | | -3 |
| Less: Global resolution (§5K2.0) | | <u>-1</u> |
| Total: | | <u>21</u> |

This total offense level, combined with a Criminal History Category I, carries a range of imprisonment of 37 - 46 months.

III.   <u>A Sentence Within the Applicable Guidelines Range is Warranted</u>

The government respectfully submits that, in this case, a sentence within the advisory Guidelines range is appropriate in light of all relevant factors, including the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

A.   <u>Legal Standard</u>

The Sentencing Guidelines are advisory, not mandatory. <u>United States v. Booker</u>, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in <u>Booker</u> that

the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

    B.     Analysis

Based on the factors set forth in 18 U.S.C. § 3553(a), a sentence within the Guidelines range – and not a sentence of 27 months, as requested by the defendant – is appropriate in this case.

        1.     The Nature and Circumstances of the Offense

The defendant has been convicted of a very serious crime: participating in the affairs of a criminal enterprise – the Colombo crime family -- in connection with which the defendant committed numerous racketeering acts. First, and significantly, the defendant operated a lucrative loansharking business, through which he generated a significant sum of money, evidenced at least in part by the defendant's substantial wealth. The wiretap and other aspects of the government's investigation revealed that the defendant made numerous phone calls nearly every day to arrange to collect loansharking payments on a weekly basis. Second, the defendant demonstrated his loyalty to both the captain to whom he reported and his fellow soldiers. Thursday nights were typically spent with his captain and other members of his captain's crew. He also regularly sought counsel from his captain to ensure that he abided by the rules of La Cosa Nostra and the Colombo crime family and demonstrated his loyalty. Third, the defendant expressed a willingness to use his relatively newfound status as an inducted member of the Colombo family to accomplish his goals. For example, upon becoming a soldier, the defendant gathered several associates and took steps to extort John Doe #10 to ensure that the rival loansharking business no longer impeded his own business. When John Doe #7 and John Doe #8 took steps to collect a debt owed to one of them, the defendant happily joined his co-defendant and fellow soldier, Daniel Capaldo, to create a show of force and make sure John Doe #7 and John Doe #8 ceased any attempts to collect that money (and in the process, made money for the crime family from the individual who owed money to John Doe #7 and John Doe #8). Finally, the defendant took steps to grow his reputation as a member of the crime family who was willing to engage in violence in order to

14

further his loansharking business. Regardless of whether the defendant actually used physical violence to collect the debt owed by John Doe #11, as he suggested he did in an intercepted telephone call, it is clear that he told others that he did and at a minimum, his boasting helped him to create and maintain his reputation and promote his own loansharking business. In sum, the defendant relished his position as an inducted member of the Colombo crime family, regularly demonstrated his loyalty to its mission and significantly profited from the crime family and his role in it.

2. The Defendant's History and Characteristics

As discussed above, the defendant's history and characteristics show that he is committed to the goals of the Colombo crime family. While the defendant does not have a prior criminal history, he has long been associated with La Cosa Nostra and in December 2018, the defendant was inducted as a full-fledged member of the Colombo crime family. In becoming an inducted member, the defendant took an oath swearing allegiance to its goals and to place the crime family above all else, including his own family. Significantly, the defendant viewed the promotion as a badge of honor and notwithstanding the oath of omerta, he gleefully shared with others, including his loansharking victims, his promotion. He even carried around a book on La Cosa Nostra in his trunk. (See Exhibit A). The government acknowledges that unlike many other individuals involved in La Cosa Nostra, the defendant also earned money through legitimate means, namely his plumbing business. But the defendant even used that to further the affairs of the crime family. For example, the defendant readily provided a fellow Colombo family soldier (and codefendant) with a fraudulent invoice to assist the soldier in filing an insurance claim. (See PSR ¶¶ 52-56). In sum, the defendant's history and characteristics also supports a sentence within the Guidelines range. 18 U.S.C. § 3553(a)(1).

2. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the defendant's offense -- racketeering -- is serious, particularly when his membership in the Colombo crime family is considered. In addition, by engaging in criminal activity under the auspices of the Colombo crime family, the defendant has demonstrated that he lacks respect for the law.

3. Affording Deterrence and Protecting the Public

The sentence must afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010).

a. <u>Specific Deterrence and Incapacitation</u>

In this case, specific deterrence and incapacitation are critical. When the defendant became a member of the Colombo crime family, he took an oath, swearing to remain loyal to this violent criminal organization for the remainder of his life. In fact, after law enforcement searched his residence and it was evident that an arrest was imminent, Scorcia proudly told Amato, "I'm a fucking man and will do whatever the fuck we gotta do and that's it. I don't care[,]" and primarily was upset that cash had been seized from his residence and that he had not had the foresight to store the cash in his mother's apartment (where law enforcement did not search). (<u>See</u> TS6 #2624). The government respectfully submits that despite numerous claims to the contrary at sentencing proceedings, aside from those who decide to cooperate against members of the mafia (and therefore are not permitted to maintain a connection to the mafia upon disclosure of their cooperation), few if any members of the mafia give up their connections to the mafia even after serving significant terms of imprisonment.

A sentence within the Guidelines range will, however, at least incapacitate the defendant, thereby protecting the public from further crimes he would otherwise commit during that period of time. Given the need for deterrence and incapacitation, the government respectfully submits that a sentence below the Guidelines range would be insufficient to protect the public from further crimes of the defendant. <u>See</u> 18 U.S.C. § 3553(a)(2)(C).

b. <u>General Deterrence</u>

In addition, a sentence within the advisory Guidelines range is necessary to deter others who are in a position to choose between a law-abiding life and a life of crime.

5. <u>Avoiding Unwarranted Disparities</u>

Finally, a sentence within the Guidelines range is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

IV. <u>A Fine Within the Guidelines Range Is Warranted</u>

The government also asks the Court to impose a fine. Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. <u>United States v. Tocco</u>, 135 F.3d 116, 133 (2d Cir. 1998). In this case, the defendant cannot sustain this burden. The government respectfully submits that the sentence in this case should include a fine within the advisory Guideline range of $15,000 to $150,000. U.S.S.G. § 5E1.2(c)(3).

CONCLUSION

In this case, given all of the facts and circumstances discussed above, a sentence within the applicable Guidelines range is necessary in order to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:   /s/
Elizabeth Geddes
Megan E. Farrell
James McDonald
Assistant U.S. Attorney
(718) 254-7000

cc: Clerk of the Court (BMC) (by ECF)
Erica T. Vest (by e-mail)
Vincent Romano, Esq. (by ECF)
Anthony DiPietro, Esq. (by ECF)